## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| In re: Vitamins Antitrust Litigation | Misc. No. 99-197 (TFH/JMF) |
|---|---|

### MEMORANDUM OPINION

This case was referred to me for the resolution of Chitwood & Harley's Motion for Court Assistance in Allocating the Court's Attorneys' Fee Award Among Plaintiffs' Counsel.  Upon consideration of the motion, opposition, and the evidence introduced during two phases of an evidentiary hearing, the motion is granted in part and denied in part.  Also ripe and ready for consideration are two additional motions.  For the reasons stated herein, Cohen, Milstein, Hausfeld & Toll's Motion to Dismiss for Failure to State a Claim is denied and Cohen, Milstein, Hausfeld & Toll's Motion to Strike Chitwood & Harley's Statement Regarding Reference to Magistrate Judge in Connection with May 4, 2004 Status Conference and for Sanctions is denied.

### I.    MOTION FOR ASSISTANCE ALLOCATING FEE AWARD

#### A.    Brief Overview

In early 1997, Boies Schiller and a group of law firms began investigating the bulk vitamins industry by interviewing witnesses and conducting research regarding the major bulk vitamins manufacturers.  Other firms also began investigations in late 1997 and early 1998.  As a result of these investigations, many firms began filing lawsuits in various districts across the country.  In March 1999, the United States Department of Justice announced that some of the defendants identified in these lawsuits had agreed to plead guilty to antitrust violations.  Two months later, two major defendants pled guilty or agreed to plead guilty for fixing the price of

vitamins; as part of their plea agreements, one defendant agreed to pay $500 million in criminal

fines, and the other agreed to pay $225 million–the largest criminal fines ever obtained by the

Justice Department.

Both before and after the announcement of the guilty pleas and fines, plaintiffs' counsel

engaged in a series of negotiations with the defendants.  Despite the fact that liability was not an

issue, the negotiations proved arduous.  Ultimately, the parties reached a settlement wherein

defendants agreed, among other things, to pay plaintiffs' counsel over $123 million in attorneys'

fees.  On July 16, 2001, Chief Judge Hogan approved plaintiffs' petition for attorneys' fees and

awarded class counsel $123,188,032.00 for work performed in relation to the settlement

agreement resolving the antitrust claims.

In order to distribute the fee awarded by Judge Hogan, Co-Lead Counsel agreed to divide

the total fee into three pools.  All 57 firms, including C&H, ratified this decision.

Each pool was headed by one of the three Co-Lead Counsel.  Susman Godfrey alone

constituted one pool and received 10 percent of the fee.  Boies Schiller's group received 54

percent of the fee, and all of the firms within that group agreed upon the allocation that Boies

Schiller made.  Cohen, Milstein, Hausfeld & Toll ("CMHT") and its group received 36 percent

of the fee awarded by Judge Hogan.  Within that pool, all of the firms accepted the allocation that

was made for them with the exception of Chitwood & Harley ("C&H").  However, instead of

requesting that its fee award be reconsidered by the full 13-member Executive Committee, C&H

filed its <u>Motion for Court Assistance in Allocating the Court's Attorneys' Fee Award Among

Plaintiffs' Counsel</u>.  This fee dispute was referred to me for final resolution.

I have thoroughly considered the arguments of each firm, the hearing transcripts from both Phase I and Phase II of the Evidentiary Hearing, the exhibits introduced therein, and the pleadings filed in relation to this matter.  In this Opinion, I summarize my findings of fact, articulate the standard of review applicable to this dispute, and analyze the facts in light of that standard.  I conclude that, because of the errors made by CMHT in distributing the fee award within its pool, C&H is entitled to some additional money, but not the amount that it has suggested to the court.

**B.**     **Findings of Fact**

1.     Beginning in the spring of 1997, attorneys that would later prosecute this action discovered and investigated a conspiracy involving antitrust violations, price fixing, and allocation of customers among manufacturers of bulk vitamins.  These firms, led by Boies Schiller, filed the first lawsuits against the manufacturers, and Boies Schiller met with the Department of Justice to disclose information it had uncovered.

2.     In late 1997, CMHT began its own investigation of the conspiracy among vitamins manufacturers.  CMHT also hired an expert to perform an economic analysis of the vitamins industry.  In early 1998, C&H also began investigating the conspiracy claims.

3.     On March 2, 1999, the United States Department of Justice issued a press release stating that a Swiss vitamins manufacturer and five United States executives had agreed to plead guilty and cooperate with the government's

ongoing investigation of illegal collusive practices in the international

vitamins industry.

4.　　　Two months later, two defendants agreed to plead guilty and pay a total of

$725 million in criminal fines.  At that point, it became clear that liability

would not be a difficult issue in the civil case.

5.　　　On May 27, 1999, this court approved the Stipulated Pretrial Case

Management Order No. 2 ("Case Management Order") naming Boies

Schiller, CMHT, and Susman Godfrey as Co-Lead Counsel.  These three

firms, in addition to C&H and Bainbridge & Straus, were appointed to the

Steering Committee.  Other firms were appointed to other committees, but

Co-Lead Counsel and the Steering Committee occupied the top two tiers

in the organizational structure of plaintiffs' class counsel.  Thus, the order

described the organization of class counsel as follows:

| Co-Lead Counsel | CMHT<br>Susman Godfrey<br>Boies & Schiller |
|---|---|
| Steering Committee | All 3 Co-Lead Counsel firms<br>Bainbridge & Straus<br>C&H |
| Executive Committee | 8 other firms |
| Discovery Committee | 3 other firms |
| Experts Committee | 3 other firms |
| Briefing Committee | 2 other firms |
| Investigations Committee | 3 other firms |

6.      Before submitting the proposed order to the court, the Case Management

Order–and the organizational structure established therein–had been

agreed upon by all of plaintiffs' counsel.  As the firm that had initiated the

investigation and led the original group of firms in prosecuting various

lawsuits, Boies Schiller naturally assumed the role of Co-Lead Counsel.

Susman Godfrey received a Co-Lead Counsel position because of the

reputation and skill of Steven Susman ("Susman") as a trial attorney and

because the firm had filed a lawsuit in Texas, which was one of the

locations that was considered a highly likely place for the case to proceed

given the pending grand jury investigation in Texas.  CMHT became Co-

Lead Counsel because of the firm's experience in class action litigation

and its work in coordinating many other plaintiffs' firms.

7.      In June 1999, all counsel, including CMHT, attended a meeting at the

Mayflower Hotel in which Boies Schiller shared with class counsel what it

knew about the case and what it had already accomplished in the litigation.

This meeting has been described as "Vitamins 101" and "Antitrust 102."

It was an attempt by Co-Lead Counsel, particularly Boies Schiller, to

ensure that all of plaintiffs' counsel had the background knowledge

necessary to proceed with the litigation.

8.      At approximately the same time, plaintiffs' counsel began to engage in a

series of intense settlement negotiations with the major defendants.  In
November 1999, they finalized an agreement with the Big 3 defendants in
the amount of $900 million and with three Japanese defendants in the
amount of $150 million.

9.      Consistent with its authority under the Case Management Order, all three
Co-Lead Counsel firms took the lead in the settlement negotiations.

10.     Although C&H argues that CMHT was an outlier during the settlement
process, the weight of the evidence clearly shows otherwise.  At the
Evidentiary Hearing, counsel for the defendants in the <u>Vitamins</u> litigation
uniformly testified that they viewed CMHT, and particularly Michael
Hausfeld ("Hausfeld"), as a tough plaintiffs' advocate and able adversary.
Defense counsel also testified that they dealt with Co-Lead Counsel, and
no other firms, during the settlement negotiations.  They specifically
identified David Boies ("Boies"), Jonathan Schiller ("Schiller"), Hausfeld,
and Ann Yahner ("Yahner") as having active and significant roles.  They
commented that Boies and Hausfeld worked as an effective team.  They
also stated that, many times, Boies would start the meetings and Hausfeld
and Yahner would drill down on various points.  This process was
repeated many times until agreement was reached.

11.     Although C&H argues that the settlement process was an easy one because
liability was not an issue, the evidence proves otherwise.  Indeed, over the

course of several months, counsel had to prepare for and resolve many
difficult issues, including monetary and nonmonetary elements of the
settlement.

12.     In conjunction with prosecuting the case and furthering the settlement
process, Co-Lead Counsel, including CMHT, performed the following
functions: they organized and ran the case, oversaw discovery, worked
with economic experts, coordinated with opt-outs, proposed ideas to break
impasses, and led settlement discussions and the drafting of settlement
papers.[1]  While executing these responsibilities, CMHT had the
opportunity to observe first-hand the contributions of each firm, including
C&H.

a.      Organize and run the case: This was the responsibility of Co-Lead
Counsel.  Co-Lead Counsel called meetings, assigned tasks,
managed the litigation on a daily basis, and oversaw the successful
settlement process.  In addition, CMHT had the specific task of
organizing the group of law firms that had not filed lawsuits with

---

[1]  CMHT goes a step farther to distinguish its contribution from that of Boies Schiller and
Susman Godfrey.  For example, CMHT argues that: (1) CMHT attorneys served as the principal
negotiators; (2) CMHT hired the firm of Nathan & Associates to perform an economic analysis
of the case, and because of its work, Hausfeld advocated for a settlement amount greater than the
$550 million that had been proposed; (3) Hausfeld proposed innovative solutions to problems
that arose during settlement; (4) Hausfeld proposed the Reverse Most Favored Nations Clause;
and (5) CMHT took the lead in drafting the settlement agreement and related documents.
Whether CMHT alone made each of these contributions, however, is not as important as the fact
that it, *along with* other Co-Lead Counsel, led the case and the settlement process.

Boies Schiller.

b.    <u>Oversee discovery</u>: The discovery co-chairs reported to Yahner

every other day.  According to Yahner, C&H made no substantive

contributions to discovery.

c.    <u>Work with economic experts</u>:  By analyzing factors such as the size

of the market and projected amount of overcharge, Nathan &

Associates, a firm hired by CMHT, and LSAG[2] helped form a basis

for establishing the appropriate amount of settlement.  Specifically,

Nathan & Associates provided a damages estimate of

approximately $1 billion, which provided the foundation for

rejecting early settlement offers and insisting on a larger settlement

sum.

d.    <u>Coordinate with opt-outs and break impasses</u>: Co-Lead Counsel

proposed and negotiated many nonmonetary elements of the

settlement agreement, including the Reverse Most Favored Nations

Clause ("Reverse MFN").  The Reverse MFN provided that the Big

6 defendants could not settle with opt-outs at a certain level

without paying the class an additional sum certain.  In this way, the

parties could reach an earlier settlement without plaintiffs worrying

---

[2] Boies testified that, in the spirit of collegiality, Nathan & Associates was retained, but the firm was unnecessary because LSAG was already performing market analysis.  Regardless of how Nathan & Associates came into the case, what matters is its contribution and CMHT's use of the information it provided to help guide the settlement numbers.

that later settlements would cause embarrassment because of higher settlement amounts reached with individual, as opposed to class, plaintiffs.  The Reverse MFN was important because the success of settlement depended on class members believing it was a good settlement, staying in the class, and getting recovery sooner rather than later.  C&H did not contribute to the creation of the concept of the Reverse MFN or play any role in securing the defendants' ultimate agreement to it.

e. <u>Lead settlement discussions and the drafting of settlement papers</u>: Boies, Schiller, Hausfeld, and sometimes Susman were the principal spokesmen at the settlement meetings.  CMHT, along with Boies Schiller, drafted large portions of the settlement documents and oversaw preparation of all settlement documents. C&H did not contribute anything of significance to the settlement meetings or the drafting and editing process.

13. As stated above, C&H did not offer anything of significance to the settlement process.  Indeed, the testimony of Martin Chitwood ("Chitwood") and Craig Harley ("Harley") establishes little more than C&H's attendance at many meetings and their review of documents being circulated among class counsel.  Despite C&H's insistence that it conducted extensive investigations, nothing of value that resulted from those investigations was contributed to the litigation.  In addition, although

C&H participated in strategy meetings and conference calls, there is nothing in the record as to any valuable contribution by C&H to the settlement of the case.

14.     Thus, even though only one tier separated the two firms in the organizational structure, there was a meaningful, substantial difference between CMHT's role and C&H's role in the litigation.

15.     After settlement was reached, plaintiffs' counsel submitted a fee petition to the court, and Chief Judge Hogan awarded class counsel more than $123 million in attorneys' fees.

16.     While the fee petition was pending, Co-Lead Counsel discussed various ways to apportion the fee award among class counsel.

17.     Early in the discussions, Schiller suggested a mechanical, arithmetic approach in which multipliers were calculated for each tier.  These multipliers were based on each firm's position within the organizational structure and the relative amount of money each tier had contributed to the litigation at the outset of the case.  The multipliers were then applied to each firm's lodestar.  Co-Lead Counsel rejected Schiller's proposed method because it failed to consider each firm's actual contribution to the case in terms of how that firm contributed to the outcome.

18.     Co-Lead Counsel ultimately agreed to divide the fee awarded by Judge Hogan into three pools, each of which would be headed by one of the Co-

Lead Counsel firms.

19.    Firms that fell within the Boies Schiller group were firms that had filed complaints early in the litigation whereas firms within the CMHT group were all other firms.  As agreed by Co-Lead Counsel, Susman Godfrey had no other firms within its pool.

20.    All 57 firms within each of the pools, including C&H, ratified this decision.  C&H agreed to the three-pool approach because it believed that the amount designated for its pool was generous.

21.    Initially, Co-Lead Counsel agreed to the following allocation for the three pools: 10 percent for Susman Godfrey, 35 percent for CMHT's pool, and 55 percent for Boies Schiller's pool.

22.    Thereafter, CMHT took the position that 35 percent would be insufficient for it to make adequate distributions within its pool.  As a result, Hausfeld persuaded Co-Lead Counsel to readjust the allocations to 10 percent, 36 percent, and 54 percent for Susman Godfrey, CMHT's pool, and Boies Schiller's pool, respectively.

23.    When this approach was adopted, it was the hope and intention of Boies and Susman that the allocations within each of the pools would be consensual, that no fee disputes would arise as a result of the allocations among plaintiffs' counsel, and that the court would not have to become involved in resolving any disagreements among counsel.  While Boies and

11

Susman wanted to avoid disruption to their own fee awards, they also believed that a fee dispute over such large sums of money would be a poor reflection on the plaintiffs' bar.

24.   As stated above, there were no allocations within Susman's pool.  Boies Schiller and CMHT, however, were responsible for making allocations within each of their pools.

25.   Every firm had the right to voice its objection to its allocation to the full 13-member Executive Committee.

26.   Before the final checks were distributed, Boies Schiller discussed with each firm within its pool the allocation it would receive, and each firm accepted the amount allocated to it.  Although the record is scant as to how these discussions were conducted, it appears that they were not open negotiations but conversations in which Boies Schiller explained the fee it intended to allocate to each firm and the reasons for the allocation.

27.   CMHT's group was not informed of the allocations CMHT planned before the allocations were made.  However, when the final checks were cut, all of the firms accepted their allocations with the exception of C&H.  In fact, various law firms wrote to CMHT expressing their appreciation for the distributions, some saying that the distributions were generous.

28.   C&H, however, objected to not being part of the process of determining the fee allocations and to the ultimate fee it received.  Specifically, C&H

12

finds it egregious that, even though the two firms were separated by only one tier in the organizational structure and, according to C&H, made similar contributions to the litigation, CMHT received over $20 million for its work while C&H received $3.47 million.

29.     CMHT justifies its fee, in part, by insisting that the 10 percent, 36 percent, 54 percent division was based on an agreement by Co-Lead Counsel that the fees allocated to Susman Godfrey, CMHT, and Boies Schiller would fall along a 1/2/4 ratio.  While there is evidence that Hausfeld discussed the possibility that his firm's fee would be twice that of Susman Godfrey's and half that of Boies Schiller's, there is no evidence that there was an iron-clad agreement about this ratio among Hausfeld, Boies Schiller, and Susman Godfrey.

30.     In addition, there is only limited circumstantial evidence that a 1/2/4 relationship formed the basis of the percentages each pool would receive. This evidence consists of the fact that: (1) there were simultaneous discussions about the 1/2/4 relationship and the division of the fee into three pools; and (2) matrices developed by CMHT, which reflected a fee of approximately $24 million for CMHT and $54 million for Boies Schiller, were exchanged between these two firms when possible allocations were discussed.  But, it is unclear whether these matrices were exchanged to show Boies what the allocations would be if CMHT received a fee between $20 and $24 million or whether they were exchanged to

13

support Hausfeld's plea to Boies for his pool to receive 36 percent, rather than 35 percent, of the total fee award.

31.    In arguing that Co-Lead Counsel agreed to a 1/2/4 relationship among their own fees, CMHT relies, in part, on a handwritten note by Boies in which Boies states, "On these figures we will be close to the 1/2/4 relationship."  However, Boies clearly testified that he did not agree to such an allocation among Co-Lead Counsel.  Rather, Boies had opined that, if CMHT's allocation within its pool resulted in roughly $24 million for CMHT, that was acceptable to him, but that was not the *only* appropriate fee allocation for CMHT.  Schiller and Susman similarly testified that they never agreed to any fee for CMHT, nor were they aware of any such agreement between Hausfeld and Boies.

32.    Given this record, the court can reach only one conclusion: Co-Lead Counsel, specifically Hausfeld and Boies, *contemplated* a 1/2/4 relationship, and a fee to CMHT that was double Susman Godfrey's and half of Boies Schiller's was *acceptable* to Boies and the other Co-Lead Counsel attorneys as long as CMHT was able to satisfactorily distribute the remaining pool money among the members of its group, but there was no agreement that CMHT was entitled to receive or would definitely receive a fee of $24 million.

33.    Despite this lack of evidence, it is clear that, when Hausfeld and Boies

were discussing potential fee awards for Co-Lead Counsel and the firms within both of their groups, it was understood that Boies Schiller would receive a fee substantially greater than CMHT, and both Boies Schiller and CMHT would receive fees substantially greater than those received by any of the other firms within their respective pools.

34.     Initially, Boies and Hausfeld also wanted some semblance of parity within the tiers (other than Co-Lead Counsel), such that firms that assumed the same positions in the litigation would receive roughly the same fees, regardless of the pools within which they were placed.  Later, Boies seemingly abandoned this concept, but CMHT retained the view that this was an appropriate consideration in allocating the fees within its group.

35.     The goal of parity, however, did not supercede each Co-Lead Counsel's responsibility for making the allocations it deemed appropriate within its own group.

36.     Yahner, a former partner at CMHT who managed the <u>Vitamins</u> litigation on a daily basis, was responsible for calculating and recommending specific allocations of money for each firm within CMHT's pool.

37.     When calculating fee awards for other firms within CMHT's pool, Yahner allocated a fee for CMHT based on Hausfeld's representations that Co-Lead Counsel had agreed to a 1/2/4 relationship among the Co-Leads. Based on a $123 million fee award, that relationship translated into a

15

$24.6 million fee for CMHT.

38.     Of the approximately $44.3 million that was designated for CMHT's pool,
        Yahner therefore set aside approximately $24.6 million for CMHT.  She
        then "crunched numbers," played with various multipliers, and developed
        matrices for allocating the remaining $19.7 million to the other 44 law
        firms in CMHT's group.[3]  These numbers were later adjusted, presumably
        because of the interest that had accrued on the fee by the time it was
        awarded by the court and allocated among the firms.

39.     Yahner's goal was to compensate firms in accordance with their position,
        lodestar, and overall contribution to the case.

40.     Yahner considered each firm's contribution relative to the litigation as a
        whole and relative to other firms that occupied the same position in the
        litigation, even if those firms belonged to the Boies Schiller pool.  Yahner
        also looked at each firm's lodestar as it compared to other firms within the
        same tier, regardless of the pool to which it had been assigned.

41.     In Yahner's (and CMHT's) opinion, C&H's lodestar overstated its
        contribution to the settlement and to the litigation.

42.     Yahner made this determination based on several factors: (1) she had
        personally overseen C&H's work, and C&H's $1.1 million lodestar

---

[3] These amounts are "approximate" because different numbers appear in various exhibits
and testimony.

16

seemed excessive given the fact that C&H had not contributed anything of value to the case; (2) C&H's lodestar seemed excessive when compared to the other non-Co-Lead Steering Committee member, Bainbridge & Straus, because that firm submitted a lower lodestar but had become involved in the case much earlier than C&H; and (3) C&H's lodestar exceeded that of CMHT and Susman Godfrey, two of the three Co-Lead Counsel in the case.

43.     Yahner was particularly concerned that C&H billed a large number of hours in the case prior to its organization as a formal MDL matter but did not provide any work product to Co-Lead Counsel that reflected that time. Similarly, C&H logged many hours after the case was organized, but Yahner did not give assignments or see work product that would reflect or justify the hours.  Yahner never addressed these issues with C&H.

44.     At the hearing, CMHT pointed out multiple problems with C&H's time sheets, although these problems were not considered by Yahner.  For example, according to CMHT, C&H attorneys consistently billed 12 minutes or longer for retrieving voicemails.  In addition, CMHT calculated that C&H spent 2217.5 hours, or 65.8 percent, of its time attending internal office conferences or reading and reviewing documents authored by other firms.  C&H spent 493.5 hours, or 14.6 percent, of its time in teleconferences and discussions with Anthony Bolognese ("Bolognese"), an attorney from another firm that also served as plaintiffs' counsel.

17

According to CMHT, C&H also spent 247.8 hours on discovery conference calls and meetings, reading and reviewing discovery plans sent to them, and office conferences discussing the discovery conference calls and meetings.

45.     Boies and Hausfeld had discussions about the fees that the two non-Co-Lead Counsel Steering Committee members (C&H and Bainbridge & Straus) should receive.  Boies and Hausfeld agreed that Bainbridge & Straus had contributed more to the litigation as a whole than C&H and therefore deserved a higher fee than C&H.

46.     At one point in time, it was discussed that C&H should receive a maximum fee of $4 million.  Yahner then calculated that a multiplier of 3.46 for each firm would result in a $4 million award for C&H and a $4.65 million award for Bainbridge & Straus (if the same multiplier were applied to that firm when Boies Schiller made the allocations within its pool). Ultimately, according to Michael Straus ("Straus"), Bainbridge & Straus received a fee between $4 million and $5 million.[4]

47.     While "crunching numbers," Yahner noted that Bainbridge & Straus' lodestar was about $200,000 greater than C&H's, but Bainbridge & Straus had become involved in the case at a much earlier date.

---

[4] Boies testified that Bainbridge & Straus received a fee "in the neighborhood of $4 million."  He also testified that the allocation to Bainbridge & Straus was reduced, in part, because of Boies Schiller's obligations to other firms that had been involved early in the litigation and had lower lodestars, but had contributed great value to the case.

48.     Yahner made the assumption that Bainbridge & Straus spent a significant

amount of time working on the case before March 1999 whereas C&H did

not.  However, Yahner did not compare the monthly time sheets of C&H

and Bainbridge & Straus.

49.     Even if she had known that, prior to March 1999, Bainbridge & Straus

billed less than 300 hours to the case, she assumes that they were getting a

client, developing a relationship with the client, and getting information

from that client–tasks that she believes Boies Schiller would consider

substantive.

50.     Yahner believed that a 3.46 multiplier was "too high" for C&H given the

firm's insubstantial contribution to the case, large lodestar, and the total

fee it was receiving.

51.     Thus, Yahner recommended that C&H receive a multiplier of 3, which

resulted in a $3.47 million fee award for C&H.

52.     Because she knew that giving C&H a lower multiplier might be

problematic, she spoke to Steven Toll ("Toll"), the managing partner at

CMHT, who had been involved in many class actions.  After discussing

the situation with Toll, she decided to keep C&H's multiplier at 3.

53.     This meant that C&H would receive a lower multiplier than firms on the

Executive Committee (which received multipliers of 4) and firms that had

served as Co-Chairs (which received multipliers of 3.75).  Admittedly, it

was inconsistent with Yahner's experience in other class action litigations for a firm at a higher tier to receive a multiplier lower than a firm at a lower tier, but she felt it was justified in this case for the reasons discussed above *and* because of the total dollar amount that was awarded to C&H.

### C.    Standard of Review

The parties have articulated divergent standards of review for the resolution of this fee dispute.  C&H argues that Co-Lead Counsel were obligated to distribute the total fee award by agreement, while CMHT contends that Co-Lead Counsel had broad authority to allocate the fee and that courts substantially defer to Co-Lead Counsel's decisions in these situations.  In determining which of these standards is correct, I have reviewed the parties' briefs as well as the original Case Management Order, Chief Judge Hogan's order awarding the fees at issues in this case, a more recent order by the Chief Judge regarding an award of attorneys' fees, relevant case law, and the testimony of the attorneys actually involved in this class litigation.  After a thorough review of these materials, I conclude that Co-Lead Counsel had broad authority to make the initial allocation of the fee.  Once C&H objected, however, Co-Lead Counsel's decisions became subject to court review to determine whether Co-Lead Counsel abused their discretion in apportioning the fees in the manner they did.

### 1.    *The Case Management Order*

Aside from specifying the firms that would assume particular roles in the class action litigation, the Case Management Order also described the responsibilities of each tier, stating: "In coordination with plaintiffs' Steering and Executive Committees," Co-Lead Counsel has the

responsibility of coordinating and directing motions, discovery, depositions, meetings, settlement

negotiations, pretrial conferences, and trial.  <u>Case Man. Order</u>, May 27, 1999, at 6.  Co-Lead

Counsel also had the duty, in coordination with the Steering and Executive Committees, to

review class counsel's monthly time and expense reports, delegate responsibilities to other

committees, and "supervise any other matters concerning the prosecution or resolution of this

case." <u>Id.</u>  The order also stated that the Steering Committee would assist Co-Lead Counsel with

the implementation of policy and that Co-Lead Counsel and the Steering Committee would

consult with the Executive Committee on all major policy decisions. <u>Id.</u> at 6-7.  The Case

Management Order did not refer specifically to a method for allocating any attorneys' fees that

may be awarded by the court.

2.    *Chief Judge Hogan's Orders*

On July 16, 2001, after the initial settlement was reached in the <u>Vitamins</u> litigation, Chief

Judge Hogan granted plaintiffs' motion for attorneys' fees and awarded class counsel

$123,188,032.00 for work performed up to that point in the litigation but stated nothing about

how the fees should be allocated among class counsel.

Three years later, in response to another petition for an award of attorneys' fees and

expenses and reimbursement of costs, the Chief Judge awarded additional fees and costs.  <u>Order</u>,

Oct. 22, 2004.  Shortly thereafter, Chief Judge Hogan issued the following order:

> In connection with this Court's October 22, 2004 Order awarding
> to class counsel ("Petitioners") attorneys' fees and a
> reimbursement of expenses in connection with a series of
> settlements in the above captioned actions, it is hereby
>
> **ORDERED** that the Petitioners allocate the attorneys' fees award
> and expense award in a manner which, in the opinion of

Petitioners, fairly compensates respective counsel in view of their contributions to the prosecution of Plaintiffs' claims;

The Court retains jurisdiction over this litigation in all matters relating to the award of counsel fees and reimbursement of expenses.

Order Re Allocating Attorneys' Fees and Reimbursements, Nov. 1, 2004, at 1.

C&H interprets Chief Judge Hogan's November 1, 2004 order as directing "all class counsel to work together to consensually allocate the Court's October 22, 2004 fee award." Chitwood & Harley's Reply to Cohen Milstein's Post-Trial Brief ("C&H Post-Trial Reply") at 1. C&H also argues that "[t]his ruling confirmed what Chitwood & Harley has argued since the beginning of this dispute: that under the Case Management Orders in this case, fee allocation decisions must be made by agreement of all counsel to whom the award is made." Id. In C&H's closing argument, counsel summarized C&H's view: because there was no 1/2/4 agreement, no authority from the court as to how to allocate the award, and no authority from another source, the only basis upon which Co-Lead Counsel could distribute the fees was by agreement.

In response to these statements, the three Co-Lead Counsel filed a statement in which they "disagree with Chitwood & Harley's position and have always acted under the premise, confirmed by precedent, that they have the *initial* authority to allocate fees. Thus, pursuant to their *initial* authority, Co-Lead Counsel allocated fees to all Class Counsel." Statement Regarding Chitwood & Harley's Reply to Cohen Milstein's Post-Trial Brief ("Co-Lead Counsel Statement") at 2 (emphasis in original). Co-Lead Counsel also cited the memorandum they submitted in connection with their 2004 fee petition, in which they explained:

This Petition is filed on behalf of Class Counsel, and allocation of fees and expenses [will] be coordinated by Co-Lead Counsel. As one court has noted, the "submission of a combined fee application

22

with actual allocations to be made by lead counsel has generally
been adopted by the courts." Class Counsel note that they followed
this same approach in the fee petition submitted after the Initial
Settlement was approved.

Id. (citations omitted).

In this court's opinion, C&H's contention that Co-Lead Counsel had an obligation to

make fee allocation decisions by agreement of all class counsel is without merit.  First, C&H

misinterprets the Case Management Order.  Far from requiring consensual allocation of awards

of attorneys' fees, the order simply did not refer to any method for allocating fees awarded by the

court.  Indeed, it established Co-Lead Counsel's responsibility for "coordinating and directing"

almost every aspect of the litigation.

Second, C&H misinterprets Chief Judge Hogan's 2004 order.  That order directed class

counsel to allocate the attorneys' fees award and expense award in a manner which, in the

opinion of class counsel, fairly compensates each firm in view of its contributions to the case.

Although a liberal reading of the order could suggest that all class counsel's opinions were

relevant to the distribution, it certainly does not mandate unanimous agreement.  In addition, it

must be read in light of the Case Management Order, which assigns responsibility for the case to

Co-Lead Counsel.

Third, even if Chief Judge Hogan's 2004 order could be read to imply that the fee

allocations had to be made consensually, that order was issued in relation to a different fee award

for work done in a separate phase of this litigation, and it was issued in October 2004–years after

the fee award and allocation at issue in *this* dispute.  It would be patently unfair to hold Co-Lead

Counsel to a standard announced three years after they apportioned the 2001 fee awarded by the

23

court.

Finally, in the memorandum submitted with their 2004 fee petition, Co-Lead Counsel

informed the court that, consistent with their approach in allocating fees and expenses after the

initial settlement and fee award, Co-Lead Counsel would again coordinate the distribution.  Chief

Judge Hogan certainly did not take issue with this approach in his October 22, 2004 or November

1, 2004 orders.

      *3.*     *Judicial Review of Fees Allocated by Co-Lead Counsel*

Because no standard for allocating the award of attorneys' fees had been set by this court

at the time the distribution was made, I will look to case law reviewing the allocation of fees to

class counsel.

In some class action cases, courts have established the standards by which an aggregate

award of attorneys' fees to class counsel shall be apportioned.  These cases have directed lead

counsel to apportion the attorneys' fees awards as they deem appropriate, based on their

assessments of class counsel's relative contributions. See, e.g., In re Indigo Sec. Litig., 995 F.

Supp. 233, 235 (D. Mass. 1998); Wells v. Dartmouth Bancorp, Inc., 813 F. Supp. 126, 132

(D.N.H. 1993); In re Linerboard Antitrust Litig., No. MDL NO. 1261, Civ. A. 98-5055, Civ. A.

99-1000, Civ. A. 99-1341, 2004 WL 1221350, at *17 (E.D. Pa. June 2, 2004) (stating that

specific allocations would be decided by liaison counsel, a procedure to which all class counsel

had previously agreed).  These courts also indicated that any dissatisfied firms could apply to the

court for relief. See In re Indigo Sec. Litig., 995 F. Supp. at 235; In re Linerboard Antitrust Litig.,

No. MDL NO. 1261, Civ. A. 98-5055, Civ. A. 99-1000, Civ. A. 99-1341, 2004 WL 1240775, at

*1 (E.D. Pa. June 4, 2004) (amending its previous order to clarify that the court retained

jurisdiction over all issues relating to fees and costs).

In deciding that lead counsel should have the initial responsibility for allocating fees from

an aggregate award, these courts noted that, because lead counsel had led the cases from their

inception, they were "better able to describe the weight and merit of each [counsel's]

contribution." In re Linerboard Antitrust Litig., 2004 WL 1221350, at *18 (quoting In re Diet

Drugs Prods. Liability Litig., 2002 U.S. Dist. LEXIS 19396 (E.D. Pa. Oct. 3, 2002)).  See also

In re Indigo Sec. Litig., 995 F. Supp. at 235 (stating that it was "in no position to evaluate the

relative merits of the lawyers' chosen litigation strategies, nor [was] it inclined to endorse one or

another of the uncharitable versions of events that counsel [had] recited"); In re Horizon/CMS

Healthcare Corp. Sec. Litig., 3 F. Supp. 2d 1208, 1212-13 (D. New. Mex. 1998) (stating that,

"given the expression of congressional intent [in the Private Securities Litigation Reform Act]

that significant investors be preferred and the fact that even before the passage of the Act, lead

counsel in such class actions exercised near plenary authority, the [c]ourt is reluctant to attempt a

detailed, retroactive analysis of the work allocation made by lead counsel").  Indeed, one court

noted that, "from the standpoint of judicial economy, leaving allocation to such counsel makes

sense because it relieves the [c]ourt of the 'difficult task of assessing counsel's relative

contributions.'" In re Linerboard Antitrust Litig., 2004 WL 1221350, at *18 (quoting In re

Prudential, 148 F.3d at 283, 329 n.96 (1998)).

In another case, prior to submitting a request for attorneys' fees, the Executive Committee

of class counsel proposed an allocation of attorneys' fees and expenses and circulated it among

25

all firms involved in the litigation.  All firms, except one, reportedly agreed to the allocation.

The court then ordered the Executive Committee to file a proposed allocation of the aggregate

attorneys' fees award.  Any firm that was dissatisfied with the allocation could file an objection.

The court then noted that, in an effort to minimize waste and duplicative efforts, it had previously

ordered that all work by class counsel be performed under the direction and coordination of the

Executive Committee.  Thus, in determining the reasonableness of the fee, the court would place

great weight on the recommendation of the committee. In re Crazy Eddie Sec. Litig., 824 F.

Supp. 320, 328 (E.D.N.Y. 1993).

As discussed above, lead counsel did not propose an allocation to all class counsel before

submitting the fee request to the court, nor did the court offer class counsel clear guidance as to

how the aggregate fee should be allocated when it awarded the $123 million to class counsel in

this case.  However, it appears that Co-Lead Counsel had the understanding that it was within

their discretion to make the initial allocation of fees, subject to court review if objections arose.

Although Boies and Susman indicated that securing each firm's assent to the ultimate allocations

was the preferred approach, the court finds that Co-Lead Counsel did not agree that the sub-

allocations within each pool would be done by unanimous agreement.

For all of these reasons, I have decided to review CMHT's actions to determine whether

it abused its discretion in allocating $3.47 million to C&H for the work it performed during the

relevant time period.  While this review is deferential, CMHT will have abused its discretion if it

relied on clearly erroneous findings of fact or failed to consider a relevant factor.  See Pigford v.

Johanns, 416 F.3d 12 (D.C. Cir. 2005) (citations omitted) (discussing the abuse of discretion

standard in the context of reviewing the district court's denial of  appellants' motions for an

extension of the filing deadlines and for reconsideration under Rule 60(b)).

**D.      Analysis**

   *1.      CMHT and C&H's Contributions to the Litigation and Settlement Process*

Throughout the Evidentiary Hearing and in their pleadings, both parties have emphasized

that neither firm was necessary to the litigation and that the case could have and would have

proceeded successfully without either of their involvement.  The court finds these arguments

unpersuasive.  What matters, in the context of this fee dispute, is not whether the case could have

proceeded without CMHT or C&H but how it did proceed, and what the firms' contributions

were, as the case proceeded with their involvement.

   a.      Co-Lead Counsel's Contributions

C&H relies on selected deposition testimony from Boies and Schiller to argue that Boies

Schiller alone developed the case, no other firm was necessary to prosecute the case, Boies

Schiller took the lead in all aspects of the case (including settlement), CMHT did not bring

anything unique to the litigation, and the settlement outcome would have been the same whether

or not CMHT and Hausfeld were involved in the case.  In addition, Schiller testified that, when

the case came together, Boies Schiller accommodated CMHT simply so that class counsel could

get an organizational structure and move on.  Similarly, Straus testified that Boies Schiller was in

charge of the case and other firms had to be accommodated and given positions within the

organizational structure because they had MDL cases pending.

C&H relies on this deposition testimony to minimize the role of CMHT in the litigation

and to extol the role of Boies Schiller.  Apparently, C&H believes that, by showing that Boies

Schiller was the *de facto* lead counsel whereas CMHT (and Susman Godfrey) were merely

27

peripheral Co-Lead Counsel members, the court will find that CMHT's role was more similar to C&H's and therefore a reduced fee for CMHT is appropriate.

The court has several problems with C&H's argument.  First, while Boies Schiller maintained a prominent role in the litigation and could have overseen the litigation without the assistance of Co-Lead Counsel, *that is not what happened.*  For a variety of practical and political reasons, once all of the MDL cases were pending, other firms had to be accommodated for the class action litigation to proceed.  Thus, what *could have* happened without the involvement of other firms is irrelevant.  The court must consider what *did* happen.

Second, it is clear that Boies Schiller was the driving force behind the initial investigation of the vitamins conspiracy.  It was Boies Schiller that led a group of firms to research the industry and uncover the illegal actions of vitamins manufacturers across the globe.  It was also Boies Schiller that shared early information with the Department of Justice, enabling the criminal investigation to begin.  Once the major defendants pled guilty and agreed to pay record criminal fines, Boies Schiller maintained its prominent role in the litigation and helped lead the settlement process, with Boies and Schiller helping to lead the discussions and Bill Isaacson (a member of Boies Schiller) drafting and editing much of the settlement document.  For all of this work, Boies Schiller was handsomely compensated, although the precise fee the firm received is unknown. Indeed, the record reflects that, although Boies Schiller received a large fee, it could have demanded more money but agreed not to for various reasons, including its desire for all plaintiffs' counsel be satisfied with their fees.  Thus, C&H's attempt to show that CMHT deserved much less than $24 million because it performed a role less than half as valuable as Boies Schiller is unavailing.  Simply put, given Boies Schiller's compromise, the court cannot

rely on following analogy, as C&H urges it to do:

$$\frac{\text{Boies Schiller's value}}{\text{CMHT's value}} \quad \text{as} \quad \frac{\text{Boies Schiller's fee}}{\text{CMHT's fee}}$$

Finally, while the role of Boies Schiller was crucial to the litigation, CMHT's role was also important.  As explained more fully in the Findings of Fact, CMHT helped organize and manage the case, on both an overall and a daily basis.  CMHT assigned tasks to various firms and oversaw the progress of discovery.  CMHT also worked with economic experts whose evaluations were critical for establishing an appropriate damages estimate.  CMHT coordinated with opt-outs and negotiated settlement provisions that were introduced when the parties came to a standstill.  Through Yahner, CMHT drafted and edited major portions of the settlement agreement.  Through Hausfeld, CMHT served as a principal negotiator during the six-month period of intense settlement negotiations.  Indeed, almost every witness except Chitwood, Harley, and Schiller recognized CMHT's valuable contributions to the litigation.

b.      C&H's Contributions

To the contrary, with the exception of Chitwood and Harley themselves, every witness testified either that: (1) C&H made no significant contribution to the case, or (2) he or she could not remember anything that C&H added to the litigation.  Indeed, even Chitwood and Harley's own testimony establishes little more than their attendance at settlement negotiations and review of documents.  For performing these tasks, C&H was given a fee that was three times its lodestar, resulting in a fee award of $3.47 million.

It must also be noted that C&H places great emphasis on its *position* within the organizational structure of the case to argue that it deserves a greater fee than was allocated to it.

29

Even before this fee dispute arose, it was clear that C&H believed that, as a member of the Steering Committee, it deserved to be involved in "all . . . calls and meetings regarding policy and other matters in which the Case Management Order provides that members of the Steering Committee shall participate." Letter from Chitwood to Co-Lead Counsel, June 7, 1999. This letter was written in response to Co-Leads' scheduling of a conference call with the Discovery Committee for the purposes of addressing that committee's role in the litigation. Thus, ten days after the Case Management Order was entered, Co-Lead Counsel perceived their role as managers of the litigation, and C&H took issue with Co-Lead Counsel's approach.[5]

However, C&H misconceives the role of the Steering Committee. As established by the Case Management Order, Co-Lead Counsel, in coordination with the Steering *and* Executive Committees, had the responsibility of directing almost every aspect of the litigation. While Steering Committee–and Executive Committee–members had a role in these matters, it was one of assistance and coordination and was simply not at the same level as Co-Lead Counsel.[6] As the record reflects, even though the Steering Committee fell only one step below Co-Lead Counsel,

_____

[5] On November 30, 1999, Chitwood wrote to Co-Lead Counsel again, complaining that non-Co-Lead Counsel Steering Committee members were wrongfully excluded–perhaps because of oversight–to a meeting with the Executive Committee.

[6] The Case Management Order states: "In coordination with plaintiffs' Steering and Executive Committees," Co-Lead Counsel has the responsibility of coordinating and directing motions, discovery, depositions, meetings, settlement negotiations, pretrial conferences, and trial. Case Man. Order, May 27, 1999, at 6. Co-Lead Counsel also had the duty, in coordination with the Steering and Executive Committees, to review class counsel's monthly time and expense reports, delegate responsibilities to other committees, and "supervise any other matters concerning the prosecution or resolution of this case." Id. The order also states that the Steering Committee would assist Co-Lead Counsel with the implementation of policy and that Co-Lead Counsel and the Steering Committee would consult with the Executive Committee on all major policy decisions. Id. at 6-7.

there was much more than "one degree of difference" between Co-Lead Counsel and the Steering

Committee.  Co-Lead Counsel had the authority to–and did–perform functions not only of a

different quantity, but also of a different quality, than C&H and Bainbridge & Straus.

For these reasons, the court will not adjust the fee allocations made to CMHT and C&H

*based on their relative contributions to the case.*  However, the court will examine the method by

which CMHT made the allocations it did to determine whether it abused its discretion.

2.        *The Allocation of the Aggregate Fee*

a.        The Three-Pool Approach v. Schiller's Approach

The court need not assess Co-Lead Counsel's decision to divide the aggregate fee into

three pools because C&H does not contest that determination.  In fact, C&H ratified the decision

because it felt that the pool in which it was placed received a generous amount of money.

However, the court will briefly address the Schiller method[7] that was initially proposed, and then

rejected, by Co-Lead Counsel because it is the same method that C&H suggests for the court to

follow when determining fair fees for CMHT and C&H.

The Schiller method was based on the following premise: each firm would receive a fee

equal to its lodestar times a certain multiplier.  The multiplier assigned to each firm would

depend on the tier to which the firm belonged, and the ratios among the multipliers were based

on the initial assessments that each tier of firms was charged once the case became organized.

Specifically, at the beginning of the case, Co-Lead Counsel each advanced $50,000, Steering

Committee members each advanced $25,000, Executive Committee members each advanced

---

[7] Technically, Schiller proposed two very similar methods, both of which were based on
the same principles.

$20,000, and all others advanced $10,000.  Accordingly, the multipliers assigned to each tier would reflect the following ratio: 5: 2.5: 2: 1.

This approach, therefore, bases fee awards on an *estimate* of responsibility that was made early in the litigation and fails to consider the *actual* responsibility assumed and contributions made by firms at each tier of the organizational structure.  A firm's proposed fee is a product of its status in the Case Management Order and its lodestar without any acknowledgment of its contribution to the case.  While it is not the court's place to determine whether this is a better or worse method of apportioning fees than the approach ultimately adopted by Co-Lead Counsel, the court cannot say that Co-Lead Counsel abused its discretion in rejecting the approach.

Additionally, it must be noted that C&H ratified the decision of Co-Lead Counsel to divide the total fee award into three pools because it thought that such a distribution was generous to the CMHT pool.  C&H has also represented that it will not seek to disrupt the allocations made to any firm outside the 36 percent pool.  Therefore, C&H seeks to apply the Schiller method solely within the 36 percent group.  According to C&H, this would result in a fee of $14.4 million for CMHT and $9.65 million for C&H.  But, if the Schiller method were applied to all 57 firms (as Schiller proposed), both firm's fees would be substantially different from C&H's calculations.  In fact, under Schiller's initial proposal,[8] the allocation of fees among Co-Lead Counsel and the Steering Committee would have been as follows:

| Firm | Total Lodestar | Multiplier | Total Fee |
|------|----------------|------------|-----------|
| Boies Schiller | $6,487,018.00 | 10.7 | $69,411,092.60 |

_____

[8] This proposal, unlike the variation, did not reserve any money for firms whose contribution significantly exceeded the fees they would receive under Schiller's initial proposal.

| CMHT | $949,096.25 | 10.7 | $10,155,329.88 |
|---|---|---|---|
| Susman Godfrey | $739,952.75 | 10.7 | $7,917,494.43 |
| C&H | $1,157,364.00 | 5.4 | $6,249,765.60 |
| Bainbridge & Straus | $1,344,387.25 | 5.4 | $7,259,691.15 |

Simply put, to apply Schiller's method only within the 36 percent pool would result in drastically different fees for both CMHT and C&H than those originally proposed by Schiller and would disrupt the integrity of his methodology.

> b.      CMHT's Allocation of Fees Within Its Pool Without the Consent or Input of Other Firms

C&H takes issue with the fact that CMHT allocated fees within its pool without the consent (or input) of other firms.[9]  As discussed above, when the three-pool approach was adopted and Boies Schiller and CMHT assumed responsibility for their own pools, it was the hope and intention of Boies and Susman that the allocations within each of the pools would be consensual so that no fee disputes would arise as a result of the allocations among plaintiffs' counsel.  Although Co-Lead Counsel did not definitively establish that the allocations within each pool had to be made by agreement, Boies and Susman understandably feared that, if

---

[9] Indeed, soon after plaintiffs' fee petition was approved, Chitwood wrote to Co-Lead Counsel requesting that the Steering Committee begin to discuss how to apportion the fee award. In that letter, Chitwood opined that, because there was no authority from the court for any firm to "mandate" fee allocation, "reaching a consensus [would] be necessary to avoid the involvement of the court." Letter from Chitwood to Co-Lead Counsel, July 30, 2001.  Chitwood wrote this letter, apparently unaware of the year-long discussions Co-Lead Counsel had been having as to how to allocate the aggregate fee.  Although there are differing views as to whether Schiller, Boies, and Susman believed that Hausfeld had discussed Co-Lead Counsel's decision, and CMHT's proposed allocation, to all firms within its group, it is clear that no such conversations ever occurred.

members of any pool were dissatisfied, any objections could disrupt other allocations made by

Co-Lead Counsel.  Therefore, it was made clear that Boies Schiller and CMHT were responsible

for allocations within their groups and any resulting discord.

Before the final checks were distributed, Boies Schiller discussed with each firm within

its pool the allocation it would receive, and each firm accepted the amount allocated to it.  As

stated above, although the record is scant as to how these discussions were conducted, it appears

that they were not open negotiations but conversations in which Boies Schiller explained the fee

it intended to allocate to each firm and the reasons for the allocation.

CMHT's group, however, was not informed of the allocations CMHT had planned before

the allocations were made.  As I have found, when the final checks were cut, all of the firms

accepted their allocations with the exception of C&H.  In fact, various law firms wrote to CMHT

expressing their appreciation for the distributions, some saying that the distributions were

generous.

C&H argues that Boies, Schiller, and Susman believed that CMHT had secured the assent

of its group members before sending payments to all of the firms within the 36 percent pool.

What Boies and Schiller believed, however, is unimportant.   As discussed above, the court finds

that it was not part of the Co-Leads' agreement that Boies Schiller and CMHT *had* to secure the

consent of all firms within their pools before making a distribution.  While this was the preferred

course of action, a lack of such agreement is not fatal to the authority of Co-Lead Counsel to

make the allocations they made.  This is especially so in light of the fact that, by making the

allocations it made, CMHT assumed responsibility for any disputes that arose among the

members of its pool.  Had CMHT secured each firm's agreement, it would not have had to face a

34

fee dispute. Because it did not, CMHT ended up in court, and its actions will be reviewed to determine whether the firm abused its discretion in doing what it did. Because there was no requirement for consensual allocations (either from the court or from Co-Lead Counsel), the court cannot say that CMHT abused its discretion when it failed to secure each firm's assent and instead proceeded in the manner it did.

        c.      CMHT's Initial Reservation of Approximately $24.6 Million for Itself

The individual responsible for determining the specific allocations to be made within CMHT's pool was Yahner, the senior attorney who had overseen the day-to-day management of the case. Before plaintiffs' fee petition was approved by Chief Judge Hogan, Yahner developed a series of worksheets in which she tested various ways of dividing the fee among the 36 percent pool.

At Hausfeld's direction, Yahner reserved approximately $24.6 million of the $44.3 million pool for CMHT alone. Hausfeld directed her to do so because, according to Hausfeld, Co-Lead Counsel had *agreed* that the relationship between Susman Godfrey's, CMHT's, and Boies Schiller's fees would be 1:2:4. Because Co-Lead Counsel determined that Susman Godfrey would receive 10 percent of the fee, CMHT would receive 20 percent of the entire fee, or roughly $24.6 million.

While there is evidence that Hausfeld discussed the possibility that his firm's fee would be twice that of Susman Godfrey's and half that of Boies Schiller's, there is no evidence that there was an iron-clad agreement about this ratio. As discussed above, CMHT relies on a handwritten note by Boies in which Boies states, "On these figures we will be close to the 1/2/4

relationship," but Boies clearly testified that he did not agree to such an allocation among Co-Lead Counsel.  Rather, Boies had opined that, if CMHT's allocation within its pool resulted in a roughly $24 million for CMHT, that was acceptable to him, but that it was not the *only* appropriate fee allocation for CMHT.  Schiller and Susman similarly testified that they never agreed to any fee for CMHT, nor where they aware of any such agreement between Hausfeld and Boies.

Given this record, the court can reach only one conclusion: there was no agreement that CMHT was entitled to receive or would definitely receive $24 million.  Despite this lack of agreement, however, it is clear that a 1/2/4 relationship was contemplated and that both Boies and Hausfeld believed that an award of roughly $24.6 million would be within the range of appropriate fees for CMHT.  It was also understood that Boies Schiller would get a fee substantially greater than CMHT, and that both of these Co-Lead Counsel would receive fees substantially larger than any other firm within their respective pools.

Whether there was *agreement* as to these ratios, however, is unimportant because, once the pools were devised, each firm was responsible for the allocations it made within its own group.  What *is* important, however, is whether CMHT abused its discretion when it made the decision to allocate $24.6 million to itself.

I find that Hausfeld did not abuse his discretion in *seeking to retain* $24.6 million for his firm for two reasons.  First, as discussed in detail above, CMHT was a major player in the Vitamins litigation.  Together with Boies Schiller and Susman Godfrey, CMHT ran the case and the settlement negotiations that resulted in one of the largest–if not the largest–settlement amounts ever secured in a class action litigation.  As one of the three leaders in this endeavor, it

36

was appropriate for CMHT to seek 20 percent of the aggregate fee awarded to plaintiffs' counsel. Second, CMHT was not the only Co-Lead Counsel to receive a multi-million dollar fee. Susman Godfrey received over $12.3 million, and although no fee amount was disclosed during the Evidentiary Hearing, Boies Schiller must have received a fee ranging between $45 and $55 million dollars. Given CMHT's integral involvement in the case, its fee, when compared with that of its Co-Leads, cannot be seen as egregious.

However, CMHT had a responsibility much greater than negotiating and securing a fee *for itself*. It also had the responsibility of apportioning an amount of money–which depended largely upon the amount of money CMHT would allocate to itself–among over forty other firms. Accordingly, while I find that it was not an abuse of discretion for CMHT to discuss and seek approval for a $24.6 million fee from its Co-Lead Counsel, I must examine whether CMHT abused its discretion when it turned to the next phase of the process: apportioning the funds within the 36 percent pool to the firms within the 36 percent pool, including itself.

d.      Yahner's Assessments and Allocations

As I indicated previously, Hausfeld directed Yahner to: (1) reserve approximately $24.6 million of the 36 percent pool funds for CMHT, and (2) divide the remaining $19.7 million among all other firms within the pool, based on their relative positions, contributions, and lodestars.

i.      Assessment of C&H's Contribution to the Case

Because Co-Lead Counsel had first-hand knowledge regarding each firm's relative contribution to the case, it is Co-Lead Counsel, not the court, that is "better able to describe the weight and merit of each [counsel's] contribution." In re Linerboard Antitrust Litig., 2004 WL

37

1221350, at *18 (quoting In re Diet Drugs Prods. Liability Litig., 2002 U.S. Dist. LEXIS 19396

(E.D. Pa. Oct. 3, 2002)).  Like the District Court of Massachusetts, this court is not "inclined to

endorse one or another of the uncharitable versions of events that counsel [have] recited."  See In

re Indigo Sec. Litig., 995 F. Supp. at 235.  However, C&H had the right to object to the court

when it was dissatisfied with its fee, and therefore the issue of CMHT's and C&H's contributions

has been placed squarely before the court.  That being said, I am reviewing CMHT's decisions to

determine whether it abused its discretion, and I am not determining whether another allocation

would have been more appropriate.

Yahner clearly testified that, based on her management of the case, C&H contributed

nothing of value to the litigation.  As discussed above, her views were corroborated by nearly

every witness who testified at the hearing.  This premise formed the background, and part of the

basis, for her decisions, and it is through this lens that Yahner recommended the allocations that

she did.

ii.      Comparisons of C&H's Lodestar to That of Other Firms

When Yahner experimented with giving different firms various multipliers, one of the

factors she considered was each firm's lodestar.  Specifically, she compared C&H's lodestar to

that of Bainbridge & Straus, the other non-Co-Lead Counsel Steering Committee member.

From the inception of the case until February 29, 2000, the following firms submitted

time sheets representing cumulative number of hours worked and total lodestar:

| Firm | Total Hours | Total Lodestar |
|---|---|---|
| Boies Schiller | 19,320.00 | $6,487,018.00 |
| CMHT | 2,898.35 | $949,096.25 |

38

| Susman Godfrey | 2,243.95 | $739,952.75 |
| C&H | 3,372.10 | $1,157,364.00 |
| Bainbridge & Straus | 4,090.00 | $1,344,387.25 |

Thus, C&H logged almost 500 more hours than CMHT and over 1,000 more hours than Susman

Godfrey, both of whom were Co-Lead Counsel in the case.  In addition, C&H charged roughly

$200,000 less than Bainbridge & Straus.  These discrepancies caused Yahner to question C&H's

hours because Bainbridge & Straus had been involved in the case since Boies Schiller's initial

investigation of the vitamins conspiracy.  Because of this early work, Yahner expected to see

Bainbridge & Straus bill substantially more hours than C&H, who joined the litigation after

much of the groundwork had already been laid.

       As stated, Yahner made this assumption but never reviewed the monthly time sheets of

each firm to determine when they had logged their hours and for what tasks.  Although Yahner

never reviewed the monthly time sheets, the court has reviewed them.  The following chart

represents the hours billed by C&H and Bainbridge & Straus from the inception of the case until

February 2000.[10]

---

[10] It should be noted that several exhibits presented at the hearing revealed varying
monthly hours submitted by each firm, but each month's totals hovered around the same number.
The slight deviation reflected in the exhibits does not affect the court's analysis.

|                                          | C&H<br>Cumulative Hours | Bainbridge & Straus<br>Cumulative Hours |
|------------------------------------------|-------------------------|-----------------------------------------|
| Inception of the case - February 1999    | 354.80                  | 284.30                                  |
| March 1999-May 1999                      | 1279.00                 | 324.90                                  |
| June 1999-February 2000                  | 1687.60                 | 3579.60                                 |

Thus, from November 1997 through February 1999, before the announcement of guilty pleas and the consolidation of the MDL cases, C&H submitted time sheets reflecting 354.80 hours while Bainbridge & Straus submitted 284.30 hours. From March 1999 through May 1999–the time period in which guilty pleas were announced, two defendants agreed to pay record-breaking fines, and the Vitamins class litigation came together in one organizational structure–C&H expended 1,279.00 hours working on the case whereas Bainbridge & Straus expended 324.90 hours. Beginning in June 1999 (after the Case Management Order was entered and the Mayflower meeting was held), C&H submitted time sheets reflecting 1687.60 hours whereas Bainbridge & Straus's time sheets totaled 3,579.60 hours.

Without reviewing the itemized time sheets to determine what each firm was doing each month, it is very difficult to determine why the hours were what they were. But, this chart demonstrates that, when Yahner made the assumptions she did about C&H's and Bainbridge & Straus' relative lodestars, (1) she made an assumption without looking at the facts to determine if her assumption was accurate, and (2) she made an assumption based on an error of fact. There is, of course, some evidence in the record that Bainbridge & Straus billed some of their early work to the "indirect purchaser" portion of the case, but the evidence, including the testimony of Straus, is hopelessly muddled, and it is impossible to quantify how much more work Bainbridge

& Straus performed in the early stages than C&H.   Nevertheless, as I have explained, the actual

hours reported by the firms do not show a significant discrepancy.   Even allowing for Yahner's

perception than C&H overbilled, her fundamental incorrect factual assumption based on a

comparison of Bainbridge & Straus and C&H's cumulative lodestars will not go away.

       iii.  Ultimate Fee Cap (as Compared to Bainbridge & Straus)

   When Boies and Hausfeld were discussing allocations of fees within their respective

pools, one issue they discussed was the ultimate fee award that C&H should receive as compared

to Bainbridge & Straus.   Boies made clear that he felt that Bainbridge & Straus should receive

more than C&H because Bainbridge & Straus had made more significant contributions to the

case, especially given their early work.[11]   Hausfeld agreed.   Because Co-Lead Counsel oversaw

the entire litigation, this court will defer to Co-Lead Counsel's assessments of the relative

contributions of the two firms and finds that their determinations are consistent with the evidence

introduced in this case.

   On the basis of these conversations, Hausfeld advised Yahner than C&H should receive

less than Bainbridge & Straus.   Initially, she played with a flat $4 million fee for C&H, which

meant that C&H's multiplier would be 3.46.   However, Yahner was uncomfortable with this fee

---

[11] C&H argues that there was additional compensation for Bainbridge & Straus in another segment of the case because Boies Schiller was unable to give Bainbridge & Straus an adequate fee when it distributed money within the 54 percent pool.   Despite the fact that it is unclear whether Bainbridge & Straus received more money when other allocations were made *because* it received less than it should have when the $123 million fee award was distributed, this court finds the argument unpersuasive for another reason.   Boies and Hausfeld, having overseen the litigation and settlement, both assessed Bainbridge & Straus as contributing greater value to the case and decided that C&H should receive less than Bainbridge & Straus for *this* portion of the case, deciding that C&H's fee *should be no more than* $4 million.

award given C&H's lack of any significant contribution to the case and the amount of money it

would be awarded for its participation.  Simply put, she felt that $4 million was "too high" an

amount.  She therefore reduced the multiplier to 3, resulting in a $3.47 million fee award.

        iv.     C&H's Multiplier as Lower than Multipliers Given to
Other Firms Lower in the Organizational Structure

The evidence before me reflects that the jockeying for position on the various committees

was animated by the lawyers' appreciation that the higher the committee position in the

organizational structure, the greater the work, consequential lodestar, and potential fee.

As will be recalled, the organizational structure was: Co-Lead Counsel, Steering

Committee, Executive Committee, Co-Chairs, and all others.  C&H, a member of the Steering

Committee, received a multiplier of 3, while Executive Committee members received multipliers

of 4, Co-Chairs received multipliers of 3.75,[12] and all other firms received a multiplier of 2.25.

Thus, when Yahner finished the distribution, C&H's lodestar multiplier of 3 was *less than* the

lodestar multiplier for the firms that were beneath it in the organizational structure.  Yahner

certainly deviated from the fundamental notion that members of the same organizational tier

should be treated relatively equally and that members of a higher tier should receive greater

multipliers than those at a lower tier.  Even she, a thoroughly honest person, recognized that

assigning C&H a multiplier lower than that of firms occupying lower tiers was unconventional.  I

have already demonstrated that, insofar as this decision was based in part on the unfounded and

erroneous assumption identified above-that C&H's hours were out of proportion with Bainbridge

& Straus' hours–it was factually incorrect.  Furthermore, this deviation from the initial rules of

---

[12] It appears that one Co-Chair received a multiplier of 4.

the game and the justifiable expectation of the concerned firms that the higher the position the

greater the fee needs much more than Yahner's perception that C&H's fee was "too high" to

justify it.  Indeed, the evidence before me indicates that lead counsel functioned truly as lead

counsel and all of the other firms' collective contribution was not great.  Given that reality, and

the lack of significant contribution below the lead counsel group, the lodestar methodology with

consistent multipliers across organizational tiers and higher multipliers for higher-level firms was

the fairest compensation scheme because it was based on the expectation the lawyers had as to

how their compensation would be determined.  In a case where it appears that most of the law

firms did much less than lead counsel, deviating from that process is irrational and arbitrary.

While C&H may have not done much, no one is seriously suggesting that their inferiors, who got

more generous multipliers, did more.

I appreciate that, when making this determination, Yahner conferred with Toll, then-

Managing Partner at CMHT, and explained her reasons for doing so.  While the court commends

Yahner's recognizing the problems her recommendations might cause and consulting with an

experienced attorney, that attorney was the Managing Partner of CMHT and surely could not

offer purely objective, impartial advice, especially when CMHT's was unavoidably affected by

the fees it allocated to other members of its pool.  While I am hardly suggesting that their

participation in the decision was in any way improper, I must say that I cannot grant their

decision the same latitude I would grant the decision from an utterly objective source.

    iv.  Application of Fair Allocation Principles to Every Firm
         Except CMHT

It is clear from Yahner's testimony that she deliberated over most of her decisions and

spent a considerable amount of time trying to make the fairest allocations possible, given her

first-hand knowledge of each firm's work on the case.  However, Yahner applied the principles

of fair allocation to every firm except her own.  She was told by Hausfeld that she was to begin

her analysis with the premise that CMHT would receive a fee of approximately $24.6 million.  In

accepting that premise without considering whether $24.6 million was justified in relation to the

contribution of all other firms, whether Co-Lead Counsel or not, Yahner made a most

fundamental mistake.  The commitment to lead counsel of the responsibility of apportioning the

fee among itself and other firms is a fundamental exercise of trust by the court.  Implicit in that

delegation is the requirement that lead counsel apply a universally fair standard of allocation to

all participants, including itself.  Allocation means proportion; how does the share lead counsel is

taking compare to the shares others are getting?  Yahner's taking as a given CMHT's share

without considering that share in proportion to the shares of the others failed to realize the court's

expectation that all of the fees–including lead counsel's–would be rationally related to each

other.

I appreciate that CMHT believed that a fair proportion of the fee among lead counsel

required that it receive what it did.  But, the analysis of the allocation of the gross amount of fee

moved horizontally, among lead counsel, and then vertically, among lead counsel and the

members of their groups.[13]  That the horizontal allocation among lead counsel was justified did

not *ipso facto* authorize lead counsel to excuse itself from making a fair allocation among its

group even if that allocation diminished the share lead counsel received.

---

[13] This is true with the exception of the fee awarded to Susman Godfrey, which
constituted its own "group."

I appreciate that it may be true that, even if CMHT had put its share in play, the result might have been the same.  Be that as it may, I have to take into account that it did something it should not have done, rendering the allocation it did make suspect and warranting court interference and judicial remedy.

### 3.    Consequence of the Errors

Because I am of the view that Yahner's determination as to C&H was flawed, the tough question becomes what to do about it.  There are, at first glance, only two alternatives:  send the entire matter back to CMHT and insist that it do it all over again or do it myself.

As to the first alternative, there is a rough analogy between this case and traditional judicial review of an administrative decision.  In the traditional case, when the court detects that the agency did not predicate its decision correctly on the facts before it or when the agency has taken as given and established a matter that actually requires the exercise of judgment and discretion, the court will remand the case.  If one persisted in the administrative law analogy, although it obviously limps,[14] errors such as those made by Yahner would warrant "remand for reconsideration."  But, in this case, a remand for reconsideration is hopelessly impractical, if not impossible.  All of the other firms have cashed their checks.  There has not been a peep of protest from any firm, except C&H, as to the fee the firm got.  In addition, it must be remembered that these are lawyers sophisticated enough to have uttered some protest and demand to know what CMHT got if they were dissatisfied with their fees.  None did, and their silence is deafening. Under any new allocation, some firms may get more, but some firms (who cashed their checks

---

[14] Obviously, administrative law judges do not have an interest in the outcome, and remanding cases flows from a sensitivity to separation of powers and an explicit congressional command not pertinent here.

years ago) may get less.  Those who get less may understandably protest and enmesh the firms

and this court in the controversy.  While this court gets paid to resolve controversies, it should do

so only when the anticipated expenditure of judicial resources can be justified by, for example,

an overarching social concern.  But, the Supreme Court has cautioned against the use of those

resources in disputes over attorneys' fees lest those disputes dwarf the resources expended in

resolving the lawsuit that itself generated the fees. Hensley v. Eckerhart, 461 U.S. 424, 437

(1983).  To invite additional litigation among law firms who seem to have been fully satisfied

with their fees because one of them, who was handsomely compensated, wants more is to go

looking for trouble.  I will not do it.

 The other solution, disqualifying CMHT and letting the court make the distribution,

denies the court and the law firms of an important resource–the benefit of the determination of

CMHT, as lead counsel, as to the firms' entitlements based on the actual, daily experience of the

development of the lawsuit and plaintiffs' victory.  On the whole, Yahner's distribution was

amply justified by what she knew about the contributions made and, while it was not flawless, I

cannot possibly say that it was such a departure from reason and rationality that it could possibly

justify imposing on the court the responsibility of re-allocating the entire fee in the absence of

any protest from any firm except C&H.  Moreover, the court's re-allocating the fee will

unquestionably invite more litigation by those who will be affected by the court's determination.

One solution presents itself: elevate C&H's multiplier from 3 to 3.75 and require CMHT

to pay the difference.  Such an adjustment would increase C&H's fee award from the $3.47

million originally calculated by CMHT to $4,340,115.00, which is in rough parity with the fee

that the other Steering Committee member, Bainbridge & Straus, received for its role in this

segment of the litigation.[15]  As a result of this adjustment, C&H will receive the same multiplier

as that of the Co-Chairs of other committees, as shown in the chart below.

| Position in the Organizational Structure | Multipliers as Determined by CMHT | Multipliers as Determined by the Court |
|---|---|---|
| Steering Committee | 3 | 3.75 |
| Executive Committee | 4 | Unchanged |
| Co-Chairs of Various Committees | 3.75 | Unchanged |
| All Other Firms | 2.5 | Unchanged |

Such an adjustment recognizes C&H's position in the litigation and compensates C&H for the

errors that were made against it.  By adjusting C&H's multiplier to 3.75, it recognizes: (1) that

CMHT, as Co-Lead Counsel, could best assess C&H's contributions, and (2) Yahner's

legitimate, and factually supported, determination that C&H contributed little to the litigation and

---

[15]As an aside, the court notes that both parties to the fee dispute compared the multipliers and percentages of each pool that various firms received.

For example, C&H compared the multipliers it assumes Boies Schiller and Bainbridge and Straus received, concluding that the ratio between the two firms' multipliers is probably 2:1, whereas the ratio between CMHT's and C&H's award is 9:1.  C&H also points out that CMHT received a much higher multiplier than Boies Schiller and that CMHT apportioned half of its pool to itself despite the fact that its lodestar represented only 11 percent of the pool's entire lodestar.

CMHT, on the other hand, points out that both C&H and Bainbridge & Straus received multipliers of approximately 3 and that their ultimate fees were proportionate.  Indeed, C&H received a higher percentage of its pool than Bainbridge & Straus.

Thus, these *post hoc* comparisons of fees cut both ways.  But, both ignore the many factors influencing the ultimate fee distribution, such as the fact that Boies Schiller agreed to accept an award that represented a lower multiplier than CMHT, that CMHT may have gotten more money for its pool than it deserved, and–most importantly–that Co-Lead Counsel made a decision to evaluate the contribution each firm made to the case, not just the time each firm spent working on the case.  For all of these reasons, the court dismisses these *post hoc* comparisons as unpersuasive.

its billable hours and lodestar were out of proportion to the value C&H added to the case.

I have chosen not to elevate C&H's multiplier to the multiplier level of the members of the Executive Committee, but rather, to that of the Co-Chairs.  I might have done so before I heard the testimony at the hearing that convinced me beyond a shadow of a doubt that C&H did not make a significant contribution to the settlement of this case.  While I cannot say that the evidence permits me to compare the contributions of all the other firms, except for Co-Lead Counsel, I can say that there is nothing in this record that convinces me that C&H's efforts justify any more than the fee initially awarded it and the increase I am ordering.  This increase is designed to correct the mistakes that I believe CMHT made without granting C&H a fee out of all proportion to the contribution C&H made to the successful conclusion of the case.

As for CMHT, it might complain that it is unfair to make it pay the full amount and that there should be, for example, an aliquot deduction from all members of the 36 percent pool. Insisting that other firms make a contribution as a result of a decision in a lawsuit in which they did not participate offends due process and invites more litigation and expense from those firms. Furthermore, as I pointed out at the hearing, by accepting the responsibility and privilege of apportioning the fee within its group and by making the allocations without conferring with the firms within its group, CMHT rolled the dice.  It is clear to me that Hausfeld could see a storm coming from C&H as to the distribution of the fee for it was Hausfeld who testified that no firm wanted C&H in its group and got the letter from C&H complaining that it was being excluded from certain matters even though is was a member of the Steering Committee.  Moreover, Hausfeld knew of the bad blood between himself and C&H.  Making an allocation of the fee without consulting anyone except itself was obviously looking for trouble.  Because CMHT erred

in the respects I have identified, it will have to pay the price of the mistake that it made. Thus, CMHT will have to pay the difference in C&H's original award and the award I have found to be fair. Despite this upward adjustment in C&H's fee, which will necessarily result in a downward adjustment in CMHT's fee, I am certain that CMHT is still being rewarded handsomely for what it has accomplished.

I appreciate that there is a potential risk that, by adjusting C&H's fee upward without insisting on a re-allocation of the entire fee, I may be ignoring that there may be firms more deserving of an increase that they will not get but C&H will. But, as I have explained, there is little evidence of such a possibility. Lead counsel did nearly all the heavy lifting, and there is no reason to believe that one of the firms within the 36 percent group deserved more than it was compensated.

Moreover, there is a significant interest that trumps whatever unfairness exists in the ultimate result. I have tried to emphasize the demanding level of trust that is imposed by the court on lead counsel. If I were to permit the factual mistake Yahner made and her failure to even consider the proportion of fees between her firm and the other firms in CMHT's pool, I would be condoning what I consider to be unacceptable behavior by lead counsel. Those fundamental deviations from what this court can reasonably expect when it delegates the responsibility to lead counsel to divide a most substantial fee warrants the upward adjustment I am requiring. In apportioning one of the largest fees ever rendered, this court can expect what Judge Cardozo described in another context as " [n]ot honesty alone, but the punctillo of an honor the most sensitive." Meinhard v. Solomon, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928). While I am hardly suggesting that CMHT did anything dishonorable, I am imposing upon it a

high standard of rational and fair solution as the only means of fulfilling the responsibility that

Chief Judge Hogan imposed upon it.  Judged by that standard, the two deviations from rationality

and fairness I have identified justify my intervening as I have.

## II.   MOTION TO DISMISS

Prior to the evidentiary hearing related to this fee dispute, CMHT moved this court to

enter partial summary judgment with respect to C&H's claim that it deserves a larger fee than it

received due to its own contribution to the Vitamins litigation.  This court denied that motion,

stating that "[w]hether C&H can produce enough evidence that its own contributions justified a

larger fee is a question of fact (to be determined after presentation of evidence at the hearing), not

a question of law (to be determined via a motion for summary judgment)." Memorandum Order,

July 15, 2004, at 4.

Citing C&H's Statement of Claim, CMHT then challenged C&H's assertion "that

CMHT's fee should be reduced, and that C&H, as arguably the only other party to this fee

dispute, should receive [all or part of] the excess."[16] Cohen, Milstein, Hausfeld & Toll's Motion

to Dismiss for Failure to State a Claim ("Mot. to Dismiss") at 1-2.  CMHT argues that C&H

lacks standing to make this claim, the claim is not justiciable, and C&H has therefore failed to

state a claim upon which relief can be granted. Id.  Accordingly, C&H's challenge should be

limited to the fee that C&H itself was allocated. Id. at 4.

C&H insists that CMHT mischaracterizes its claim and that C&H "has never argued that

it should receive excess funds taken by Cohen Milstein as a simple matter of default." Chitwood

_____

[16] CMHT clarifies in its reply that, as demonstrated at trial, C&H's position was that it
deserved most of the alleged excess, not all of it. Cohen, Milstein, Hausfeld & Toll's Reply in
Support of Its Motion to Dismiss for Failure to State a Claim ("Reply to Mot. to Dismiss") at 1.

& Harley's Opposition to Cohen, Milstein, Hausfeld & Toll's Motion to Dismiss ("Opp. to Mot. to Dismiss") at 1.  Rather, C&H summarizes its claims as asking the court to "determine the fees for Chitwood & Harley and Cohen Milstein based on the contribution each firm made to the litigation relative to the contributions made by all other firms in the litigation." Id.

To satisfy Article III's standing requirements, "a plaintiff must show (1) it suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000) (citing Lujan v. Defenders of Wildlife, Inc., 504 U.S. 555, 560-61 (1992)).  The traceability and redressability requirements may be considered together because they "overlap as two sides of a causation coin." Dynalantic Corp. v. Dep't of Defense, 115 F.3d 1012, 1017 (D.C. Cir. 1997).

This obligation of establishing standing finds its source in separation of powers concepts that limit potential judicial interference with the actions of the other two branches of government. This prudential refusal to entertain actions has nothing to do with claims of private wrongdoing. As Wright & Miller explain:

> More important, [standing] has been very much tied to litigation
> asserting the illegality of governmental action, whether the
> assertion has been that executive or administrative action is beyond
> the limits of statutory authorization or has been that a statutory
> authorization has exceeded constitutional limits. Claims of private
> wrongdoing ordinarily are asserted by persons obviously having
> the enforceable interest, if anyone has; such problems as arise
> commonly are handled in terms of defining private causes of action
> or of identifying the real party in interest.

Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, <u>Federal Practice and Procedure</u>, §

3531 at 341 (2d. ed. 1984) (citing <u>Blackmar v. Lichtenstein</u>, 578 F.2d 1273, 1276 (8th Cir.

1978); <u>Von Brimer v. Whirlpool Corp.</u>, 536 F.2d 838, 841 n.1 (9th Cir. 1976); <u>Malamud v.

Sinclair Oil Corp.</u>, 521 F.2d 1142, 1147 (6th Cir. 1975)("[S]tanding pertains to suits brought by

individuals or groups challenging governmental actions which have allegedly prejudiced their

interests.  On the other hand, the real party in interest question is raised in those rarer instances

where a plaintiff's interest is not easily discernible."); <u>Baxley v. Rutland</u>, 409 F. Supp. 1249,

1256-1257 (D.C. Ala. 1976)).

 First, no one is suggesting that C&H is not the real party in interest.  Second, the

uncontradicted evidence before me establishes that, after Hausfeld determined CMHT's fee, he

told Yahner to use that as the premise of the distribution she made to the other firms.  Yahner

then determined C&H's multiplier and the resulting fee.  Thus, two partners of CMHT made the

two fundamental decisions that dictated the fee C&H received, and this controversy between

them is the direct product of those decisions.  It is incorrect, in the teeth of that evidence, to argue

that the controversy between CMHT and C&H is not justiciable and does not state a claim upon

which relief can be granted.  As best as I can tell, CMHT's misplaced reliance on "standing

concepts" leads to the conclusion that there is some impediment to the resolution of this

controversy because it may necessarily follow that, if I concluded that C&H was to be given

more, the amount to be given to C&H may come exclusively from CMHT's share.  But, how I

resolve the merits of the controversy has nothing to do with my jurisdiction to do so.  In addition,

as the previous sections of this Opinion indicate, CMHT made errors in determining C&H's fee

award and, *because of CMHT's actions*, it will have to bear the consequences of its own

mistakes.

## III.   INTEREST

CMHT sent a check to C&H in October 2001 representing CMHT's calculation of

C&H's fee, but C&H refused to accept it.  CMHT then put the proceeds of the check in an

interest-bearing escrow account where the money has remained ever since.  CMHT indicates that

it will turn over the interest the account has earned once this controversy ends, but C&H is

unsatisfied.  It says that it should not be saddled with the investment choices CMHT made and

demands interest calculated at a different rate–one that reflects the market or prime rate.

C&H's position reminds me of the Chinese curse–may you get what you want.  C&H

blissfully ignores that, if CMHT's investment outperformed the prime, CMHT keeps the

difference, laughing all the way to the bank.

More to the point, I have no reason whatsoever to believe that CMHT maliciously

invested this money to diminish the return on it if C&H ever got it.

There is one loose end–whether C&H is also entitled to interest on the additional amount

I am awarding it.  As it concedes, whether I should award such interest resides in my discretion.

There are two statutory sources for the award of pre-judgment interest, D.C. Code § 15-108 and

D.C. Code § 15-309.

### A.   D.C. Code § 15-108

In an action in the United States District Court for the
District of Columbia or the Superior Court of the District of
Columbia to recover a liquidated debt on which interest is payable
by contract or by law or usage the judgment for the plaintiff shall
include interest on the principal debt from the time when it was

due and payable, at the rate fixed by the contract, if any, until paid.

D.C. Code §15-108.

"A liquidated debt must be an easily ascertainable sum certain at the time it arose."

Athridge v. Iglesias, 382 F. Supp. 2d 42, 49 (D.D.C. 2005) (citing M. Pierre Equipment Co., Inc.

v. Griffith Consumers Co., 831 A.2d 1036, 1041 (D.C. 2003)).  Obviously, because this Opinion

determines what is due from CMHT to C&H, the "debt" could not possibly have been liquidated

when it arose, and this statute is inapplicable.

### B.      D.C. Code § 15-109

> In an action to recover damages for breach of contract the judgment shall allow interest on the amount for which it is rendered from the date of the judgment only.  This section does not preclude the jury, or the court, if the trial be by the court, from including interest as an element in the damages awarded, if necessary to fully compensate the plaintiff.  In an action to recover damages for a wrong the judgment for the plaintiff shall bear interest.

D.C. Code § 15-109.

I recently surveyed the case law pertaining to this statute and first concluded that it has

been interpreted to permit but not require the award of pre-judgment interest in contract and

conversion actions and that the courts of the District of Columbia have allowed such interest in

tort cases. Athridge, 382 F. Supp. 2d at 52-53.  The fundamental criterion guiding the exercise of

discretion to award pre-judgment interest is whether plaintiff will be fully compensated without

it. Duggan v. Keto, 554 A.2d 1126, 1140 (D.C. 1989)(conversion case).

As noted above, C&H rejected the check that CMHT sent it.  CMHT put the proceeds in

an interest-bearing account, and I have concluded that C&H is entitled to the interest the escrow

bearing account in fact gained.  The question presented is whether C&H will not be made whole unless I also grant interest on the additional amount I am awarding from August 14, 2001, the day CMHT sent the check, to the date of this Opinion.

One view of the situation would be to read this Opinion to mean that CMHT should have awarded C&H the amount of money that I have calculated when it first made the distribution.  It then follows that C&H can only be made whole by being awarded interest on that additional money because, in the interim, CMHT has had the use of the money that I am now insisting be given to C&H.

That, however, is a superficial reading of what I have done.  First, it cannot be said as a pure matter of logic that C&H would have gotten what I am granting it had CMHT allocated the fee other than the way it did.  C&H might have gotten less or more depending on how CMHT treated itself and the other firms.  Second, the remedy I have chosen is the only one I practically have left that avoids condoning what I believe were significant deviations from the standards to which lead counsel, charged with distributing a fee, must be held.  It is a compromise between two unacceptable alternatives:  doing nothing and re-allocating the entire fee.  This is simply not a case where a party disputes its opponent's entitlement to a certain fund and the court ultimately concludes that the opponent should prevail.  Because the losing party has had the fund in the interim, a sense of balance requires that the winning party should get the same benefit the losing party had by being able to invest the funds in the interim.  In this case, I have reached a middle ground and made an award of an amount that is motivated by a desire to avoid unacceptable alternatives.  I cannot equate the situation here with the ones encountered in the case law I surveyed in Athridge where one party can truly be said to have held onto something that clearly

55

belonged to someone else.  I will therefore not award any additional interest other than the interest actually gained by the funds in the interest-bearing account.

## IV.    SANCTIONS

On October 2, 2001, this court issued an order requiring that all filings in the instant case be filed under seal.  On April 2, 2004, Chief Judge Hogan vacated that order.  Shortly thereafter, CMHT wrote a letter to the court asking it to reconsider the April 2, 2004 ruling and to keep filings related to the fee dispute confidential.  On May 4, 2004, I held a status conference to discuss the issue of confidentiality as well as the procedures that would govern the upcoming hearing on the fee dispute.  At the conference, I emphasized that the proceedings could not continue under seal, but the court invited counsel to review three particular cases and formulate their positions on how they thought the case should proceed.  I repeatedly emphasized that I was not a private arbitrator and that, because the proceedings were in United States District Court, they would be public.  I also indicated, however, that I could opt to follow the hybrid approach of Judge Kollar-Kotelly in McConnell v. Federal Election Commission, 251 F. Supp. 2d 919 (D.D.C. 2003), which maintained all documents as confidential except for the final order and documents cited therein.  A follow-up status conference was set for the following week, at which time the parties would reconvene, and I would determine how the case would proceed.

On May 7, 2004, C&H publicly filed its Statement Regarding Reference to Magistrate Judge in Connection with the May 4, 2004 Status Conference ("Statement").  Thereafter, CMHT filed a motion to strike the Statement and for sanctions.  In essence, CMHT argues that the Statement should not have been filed publicly because, at that point, the court had not resolved the confidentiality issue.  Cohen, Milstein, Hausfeld & Toll's Motion to Strike Chitwood &

Harley's Statement Regarding Reference to Magistrate Judge in Connection with May 4, 2004 Status Conference and for Sanctions ("CMHT Mot.") at 4.  CMHT asserts that C&H "at best exploited an ambiguity before the Court issued a final decision and at worst disregarded the guidance of the Court." Id. at 5. CMHT also claims that the Statement wrongfully quotes from a confidential document because the court never authorized disclosure of material that had already been submitted and marked as confidential. Id.  Finally, CMHT claims that the Statement contains numerous misrepresentations about the facts underlying the fee dispute and CMHT's position. Id.

C&H opposes the motion and requests attorneys' fees and costs.  Specifically, C&H states that its statement should not be stricken from the record because it was not only proper, but also necessary, for C&H to make its filing public. Chitwood & Harley's Opposition to Cohen, Milstein, Hausfeld & Toll's Motion to Strike Chitwood & Harley's Statement Regarding Reference to Magistrate Judge in Connection with May 4, 2004 Status Conference and for Sanctions ("C&H Opp.") at 2.  Specifically, C&H points out that, at the time it filed its Statement, there was no sealing order in place because Judge Hogan had vacated the provisional sealing order one month earlier.  Id. at 3.  In addition, C&H argues that the pendency of a motion to reconsider an order (even if it had been filed properly with the court) does not alter the finality of the court's decision.  Id. at 3 n.2 (citing to Fed. R. Civ. P. 60).  C&H further argues that the discovery record provides an evidentiary basis for the claims made in the Statement and that its contents are accurate.[17]

---

[17] In its opposition, C&H provides a lengthy discussion of its view of the merits of the case.  Similarly, in its reply, CMHT sets forth its view of the case.  As the court relayed to the parties when the court declined to set a pre-hearing briefing schedule, however, the court are not

As is usually the case, each party has offered a rendition of the dispute that is beneficial to its own claims, but the truth lies somewhere in between.  As for the issue of whether the Statement should have been filed publicly, it would have been much more courteous of C&H to postpone its filing until after the second status conference and after there was a more definite resolution of how purportedly confidential materials would be handled in this dispute.  However, we passed the point of courtesy long ago.  In addition, when C&H filed its Statement, *there was no sealing order in effect* because Chief Judge Hogan had vacated the sealing order one month earlier.  Although CMHT had sent a letter to me seeking reconsideration of the minute entry, no formal motion seeking reconsideration of that order had been filed.  In addition, although I had discussed the possibility of maintaining the confidentiality of certain documents at the May 4, 2004 status conference, I also emphasized that further proceedings would be on the public record.  Given my statements from the bench, both parties' arguments are reasonable interpretations of where the case stood at the end of the status conference, and striking the Statement or awarding sanctions would be unjust.

---

allowing pre-hearing briefs to be filed.  Still, it is understandable that C&H included its discussion in response to CMHT's claim that its representations were inaccurate and that "C&H has turned its unfounded vendetta against Michael Hausfeld and CMHT into a protracted attempt to blackmail one of the Co-Lead Counsel into allocating an undeserved and unfair fee." See CMHT Mot. at 6.  Similarly, CMHT included its discussion in response to C&H's overview of the case and its claim that "[n]ine months of discovery has generated an evidentiary record so favorable to Chitwood & Harley that Cohen Milstein has renewed its efforts to have the entire proceeding conducted in secret.  It appears from Mr. Hausfeld's April 9, 2004 letter to Judge Facciola that Cohen Milstein regards as embarrassing the information that has been revealed in discovery concerning the fee it allocated to itself and the level of its contribution to the class, and seeks to keep these matters hidden." Statement at 10.  Despite their lengthy discussions of the case, which often degenerated into mudslinging, it would be inappropriate for the court to address the merits, except to acknowledge that each side has a remarkably different interpretation of the underlying settlement negotiations and distribution of fees and that each side offers evidence in support of its view.

As for CMHT's claims that the Statement should be stricken because it contains inaccurate characterizations and representations, any party in an adversarial proceeding would make the same claims against its opponent, arguing that the other side has it all wrong.  In this case, each side has marshaled evidence supporting its version of the story, and in particular whether the opposing party made any significant contribution to the settlement agreements that occurred before the fee dispute arose, and each party has cited portions of deposition testimony to support its allegations.  That is typical advocacy and I will not sanction it.

C&H also claims that CMHT failed to abide by the procedures outlined in Rule 11 of the Federal Rules of Civil Procedure in bringing its motion for sanctions and requests attorney's fees under that rule.  CMHT replies that it did not bring its motion under Rule 11; rather, it sought an award of sanctions pursuant to the court's inherent authority to punish litigation conduct executed in bad faith.  Cohen, Milstein, Hausfeld & Toll's Reply in Further Support of Its Motion to Strike and for Sanctions ("CMHT Reply") at 14-15.

> It is well established that a court possesses the inherent power to monitor litigation closely and to sanction litigants for abusive practices. Roadway Express, Inc. v. Piper, 447 U.S. 752, 764-65, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980). Prior to an award of sanctions under its inherent powers, a court must make an explicit finding that counsel's conduct "constituted or was tantamount to bad faith." Id. at 767, 100 S.Ct. 2455.  It is recognized that the court's inherent powers permit the imposition of sanctions "when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Chambers v. NASCO, Inc., 501 U.S. 32, 111 S.C. 2123, 115 LED.2d 27 (1991).  A party demonstrates "bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." Hutt v. Finney, 437 U.S. 678, 689 n. 14, 98 S.C. 2565, 57 LED.2d 522 (1978).

Alexander v. F.B.I., 186 F.R.D. 6, 11 (D.D.C.1998).  Here, although I undoubtedly have the

authority to award sanctions, there is not enough evidence to show that C&H acted in bad faith. At worst, C&H presented select portions of evidence to support its one-sided interpretation of the facts, which most advocates do when trying to secure a favorable decision. In addition, although CMHT claims that C&H disregarded the court's guidance when it filed its Statement publicly, C&H offered a reasonable justification for doing so, and as soon as the issue of confidentiality was clarified, it filed all of its submissions according to the orders of this court. Simply put, there is no basis upon which this court can make a finding of bad faith, and CMHT's motion should be denied.

## V.     CONCLUSION

For the reasons stated herein, I will require CMHT to (1) pay C&H $4,340,115.00 and (2) the interest the escrow account actually gained on the check with which C&H was initially presented from the date of its deposit to that account to the date of its withdrawal.

An Order accompanies this Memorandum Opinion.

_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

Dated: